UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

DENNIS J. DEERY,

        Plaintiff,

v.                                                    Case No.  5:06-cv-99-Oc-GRJ

MICHAEL J. ASTRUE,[1] Commissioner
Of Social Security,

        Defendant.
_____

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 8 & 9). For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on January 24, 2003, alleging disability commencing on September 25, 2002. (R. 54-57.) Plaintiff's application was denied initially (R. 54-55) and upon reconsideration. (R. 38-39, 41-42.) Plaintiff requested a hearing before an Administrative Law Judge, which was held on January 31, 2005. (R. 35-36, 189-217.)

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g)

On April 27, 2005, following the hearing, Administrative Law Judge Arthur W. Stacy (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 13-22.) Plaintiff's request for review of that decision was denied by the Appeals Council on January 11, 2006 (R. 5-7), rendering the ALJ's decision the final decision of the Commissioner. On March 14, 2006, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider
(continued...)

district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

---

[5](...continued)
evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

disabled.[12]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
   In practice, the burden temporarily shifts at step five to the Commissioner. The
   Commissioner must produce evidence that there is other work available in
   significant numbers in the national economy that the claimant has the capacity to
perform.  In order to be considered disabled, the claimant must then prove that he is
unable to perform the jobs that the Commissioner lists. The temporary shifting of the
burden to the Commissioner was initiated by the courts, and is not specifically provided
for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

exertion."[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on May 6, 1946 and was fifty-eight years old at the time of the decision. (R. 22, 54.) He completed schooling through the eighth grade. (R. 197.) Plaintiff worked as a truck driver until September 25, 2002 when the company went out of business. (R. 70-71.) Thereafter, Plaintiff claims he was unable to find work due to his medical problems with his left foot, right knee, left shoulder and neck, and melanoma. (R. 70.)

---

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

[21] Id.

Based upon the evidence submitted and the testimony presented at the hearing, the ALJ determined that Plaintiff suffers from the following impairments: right shoulder impingement, degenerative disc disease and a history of meniscus tear. (R. 18, 21.)

The medical records relevant to this appeal begin with Occupational Health & Wellness treatment notes from June 25, 1999 following an incident where Plaintiff "slipped out of a tractor and twisted [his] left leg," resulting in left knee pain. (R. 107.) Follow-up treatment notes from July 6, 1999 contain a notation that Plaintiff was able to work without restrictions. (R. 105.)

The next set of notes are from Gerald G. Glass, PAC, Psy. D, FAAPA on February 14, 2001 for an evaluation of Plaintiff's right knee pain. (R. 100-101.) Plaintiff told Glass that he twisted his right knee while strapping down freight the prior day. (R. 100.) Plaintiff complained of continuous excruciating pain in his knee, hamstring and calf, as well as inability to put his weight on the knee. *Id.* After examining Plaintiff, Glass's impression was "[r]ight knee rule out internal derangement the MCL as well as PCL." (R. 101.) Glass ordered an MRI of the right knee and prescribed Plaintiff crutches and Tylenol with Codeine. *Id.* Glass noted that Plaintiff was unable to return to work at that time. *Id.*

The next records relating to Plaintiff's right knee problems are from Dr. Gary J. Kelman of Orthopaedic Associates USA on April 24, 2001. (R. 142-143.) The treatment notes reveal that Plaintiff underwent right knee arthroscopy,[22] partial medial

---

[22] Endoscopic examination of the interior of a joint. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

meniscectomy[23] of the posterior horn and posterior body, limited medial synovectomy[24] and patellar chondroplasty.[25] (R. 143.) Dr. Kelman scheduled therapy for Plaintiff and noted that Plaintiff was unable to work. *Id.*

Plaintiff returned on May 1, 2001 for reevaluation. (R. 141-140.) Plaintiff reported improvement. (R. 141.) At that time, Dr. Kelman noted that Plaintiff could "work with restriction so sedentary work only." (R. 140.) On May 15, 2001, Plaintiff reported weakness in his right lower extremity and difficulty walking on stairs. (R. 139.) Dr. Kelman restricted Plaintiff from working with no prolonged standing or excessive walking, no climbing, bending, stooping, squatting, or kneeling. (R. 138.)

During his reevaluation on August 3, 2001, Plaintiff complained of continuous pain, primarily anteriorly. (R. 134.) Plaintiff reported that he had not been working because light-duty work was not available to him. *Id.* A physical examination revealed normal gait, no thigh or calf atrophy and no swelling or effusion in the right knee. *Id.* Moreover, Plaintiff's range of motion was full and he was able perform a straight leg raise without extensor lag. *Id.*

Treatment notes from August 29, 2001 state that Plaintiff's only complaint was anterior knee pain with repetitive kneeling, bending, stooping and squatting. (R. 133.) Dr. Kelman noted that Plaintiff "may work at his full duty status as a functional trial" and "if patient can perform his normal job without difficulty, then he will be allowed to work without restrictions." *Id.* Thereafter, on September 31, 2001, Plaintiff reported that he

---

[23] Excision of the meniscus, usually from the knee joint. *Id*.

[24] Excision of a portion or all of the synovial membrane of a joint. *Id*.

[25] Reparative or plastic surgery of cartilage. *Id*.

had been back to work at his full duty status for the past two weeks and was able to work with some pain. (R. 132.)

A year later, Plaintiff returned for reevaluation stating that he felt well but had some pain when pulling a heavy pallet jack or when walking up or down the incline ramp at work. (R. 139.) An X-ray of the knee revealed only mild degenerative changes. (R. 130.) Dr. Kelman opined that Plaintiff's injury remained unchanged and there was no need for work restrictions. (R. 131.)

With regard to Plaintiff's shoulder impingement, Dr. Thomas F. Bendowski, an orthopedic surgeon, examined Plaintiff on December 3, 2001 to follow-up on his left shoulder and left foot. (R. 163.) Upon examination of the shoulder, Dr. Bendowski noted "a positive impingement sign" but full range of motion and good strength. *Id.* The following year, Plaintiff complained of limited function in his foot and shoulder. (R. 161.) Plaintiff also reported losing his job when the company went under just six months prior to his retirement, and that he was "unable to find any other employment secondary to his disabilities." *Id.* Dr. Bendowski diagnosed Plaintiff with stable impingement syndrome of the left shoulder. *Id.* The treatment plan stated that, "[i]f everything remains stable, he is going to follow up with me in a year for an annual check up or sooner on a PRN basis." (R. 162.)

Dr. Bendowski described Plaintiff's impairments and limitations on a form dated July 23, 2002. (R. 156.) He stated that Plaintiff had loss of motion due in part from left shoulder pain. *Id.* Dr. Bendowski further noted that Plaintiff was unable to squat and walk on toes. *Id.*

During his yearly follow-up, Dr. Bendowski examined Plaintiff for problems with pain his left shoulder on July 23, 2003. (R. 160.) Dr. Bendowski recommended an MRI scan to see if the rotator cuff was in tact, and if not, he recommended surgical treatment. *Id.* An August 13, 2003 MRI revealed a normal rotator cuff but noted a "mixed signal change in the superior labrum, which may represent intrasubstance degeneration." (R. 159.) During reexamination on August 6, 2003, Plaintiff reported right shoulder symptoms with forward and overhead reaching activities. (R. 157.) Dr. Bendowski diagnosed Plaintiff with right shoulder impingement. *Id.*

The only medical record regarding Plaintiff's back impairments is an MRI taken on May 10, 2002 revealing degenerative disc changes and disc bulges at multiple levels. (R. 111, 173.)

The Office of Disability Determinations referred Plaintiff to Dr. Edward Demmi for a consultative physical examination. (R. 144.) Dr. Demmi's letter dated May 1, 2003, stated that Plaintiff complained of chronic right knee pain, neck pain and melanoma. *Id.* Due to his torn medial meniscus of the right knee, Plaintiff had problems walking fast, squatting, changing positions and walking one block without experiencing pain. *Id.* Plaintiff also reported a history of degenerative disc disease of the cervical spine due to the movements to see through side mirrors required by truck driving. *Id.* At the time, Plaintiff was taking the medications Lorcet, Halcion and Flomax. (R. 146.)

Dr. Demmi noted a motor strength of 5/5 for Plaintiff's shoulders and knees. *Id.* He reported crepitus of Plaintiff's right knee and tenderness to palpation of the great trochanter*. Id.* Dr. Demmi reported no limitations, finding Plaintiff's range of motion

normal, motor sensory and reflexes normal, and straight and seated leg raises normal. (R. 147.)

State agency non-examining physician, Dr. Reuben E. Brigoty, filled out a Physical Residual Functional Capacity Assessment of Plaintiff dated May 30, 2003. (R. 148-155.) Dr. Brigoty reported Plaintiff's exertional limitations included, occasionally lifting 50 pounds, frequently lifting 25 pounds, standing and/or walking for a total of 6 hours in an 8-hour workday, siting for a total of 6 hours in an 8-hour workday and unlimited pushing and pulling. (R. 149.) Plaintiff's postural limitations included occasionally climbing, otherwise Plaintiff could frequently balance, stoop, kneel crouch and crawl. (R. 150.) Dr. Brigoty noted that Plaintiff should avoid extreme sun and heights. (R. 152.)

State agency non-examining physician, Dr. Eric C. Puestow, filled out a Physical Residual Functional Capacity Assessment dated November 11, 2003. (R. 165-172.) Dr. Puestow found the same exertional limitations as Dr. Brigoty. (R. 166.) However, he did not note any postural limitations and did not recommend any environmental limitations for Plaintiff. (R. 167.) Dr. Puestow circled the box on the assessment that the severity or duration of Plaintiff's symptoms was disproportionate to the expected severity or duration based on the Plaintiff's impairments. (R. 170.)

## IV. **DISCUSSION**

Plaintiff argues that the ALJ erred at step four of the sequential evaluation when "finding that claimant has residual functional capacity to perform a significant range of medium work despite the claimant's clear and significant pain documented by the record." According to Plaintiff, the ALJ failed to take into account his pain in performing

10

the assessment of Plaintiff's RFC, and thus the finding by the ALJ that the Plaintiff has the RFC to perform medium work and return to his past relevant work as a truck driver is not supported by substantial evidence. Plaintiff contends that the ALJ's RFC assessment was not supported by substantial evidence and that instead the evidence supports the conclusion that Plaintiff could not perform work at the medium exertional level. Lastly, the Plaintiff suggests that the ALJ erred in rejecting his subjective complaints of disabling pain.

Turning first to the ALJ's RFC assessment, the ALJ found that Plaintiff was limited to performing medium work, sitting for six hours in an eight-hour workday, standing and/or walking for about six hours in an eight-hour workday with normal breaks, and avoiding concentrated exposure to extreme sun, fumes, odors, dusts, gases, or poor ventilation.

This is RFC assessment is fully supported by the evidence. The evidence disclosed that Plaintiff's treating physician, Dr, Kelman, released Plaintiff to full work status without restrictions only one month before the alleged onset date. Moreover, the ALJ properly pointed out that four months after Plaintiff's alleged onset date, Dr. Bendowski - who treated Plaintiff's shoulder impingement - reported no work restrictions and advised that he did not plan to reexamine Plaintiff until one year later if Plaintiff's condition "remains stable." This evidence demonstrates that Plaintiff's own doctors took Plaintiff's level of pain into account in their decisions regarding the need for further treatment and their decisions to release the Plaintiff to work.

Moreover, the results of the examination by Dr. Demmi, the consultative examiner, also support the ALJ's RFC assessment.  The May 2003 consultative

examination conducted by Dr. Demmi revealed that Plaintiff's motor strength for his shoulders and knees was a 5/5. (R. 19, 174.) While Dr. Demmi reported right knee crepitus and tenderness Dr. Demmi, nonetheless, found that Plaintiff's range of motion was normal, his motor sensory and reflexes were normal, and his straight and seated leg raises were normal.

Further, an August 2003 examination by Dr. Bendowski evidenced that Plaintiff had full active and passive range of motion in his right shoulder and full range of motion in his left hip. (R. 20, 157.) The state agency doctors reviewed this evidence and found that Plaintiff was capable of medium work with limited postural and environmental limitations, all of which is fully consistent with the RFC assessment by the ALJ.

The Plaintiff points to other evidence, which he contends supports his argument that the ALJ improperly determined that Plaintiff was capable of performing medium work. While some of the medical notes cited by Plaintiff arguably document some restrictions greater than medium work, the evidence stands in isolation and when viewed in context and against the evidence relied upon the ALJ fails to establish error in the ALJ's RFC assessment.[26] Thus, rather than arguing that the evidence relied upon by the ALJ does not support his RFC assessment, Plaintiff instead suggests that other isolated evidence supports a different RFC assessment. The Court, of course, is not authorized to engage in a *de novo* RFC assessment but rather the Court's standard of review is to determine whether the ALJ's findings are supported by substantial evidence and are

---

[26] For example, in 2001 Dr. Kelman reported that Plaintiff could not find "light duty" work. While Dr. Kelman's notes do reflect this statement, a short time later on August 29, 2001 Dr. Kelman removed the restrictions and released Plaintiff to work at full duty status. Further, Dr. Kelman noted that a functional capacity evaluation date August 16, 2001 reported that Plaintiff could work in the "heavy work classification category with maximum occasional floor to knuckle lifting of 87 pounds." (R. 133.)

based upon the correct application of the law. Accordingly, the Court declines to engage in a new RFC analysis. Suffice it to say, that the evidence highlighted by Plaintiff in his brief was considered and analyzed by the ALJ and was determined not to establish that Plaintiff was more limited than the medium exertional level. Therefore, the evidence cited by Plaintiff in his brief fails to support Plaintiff's suggestion that the RFC assessment by the ALJ was erroneous.

Lastly, Plaintiff suggests that the ALJ's RFC assessment was in error because the ALJ improperly rejected Plaintiff's complaints of disabling pain. The law concerning the analysis of subjective complaints of pain is well settled. In evaluating disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms, such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[27] The Eleventh Circuit has set forth a three-part test for determining when a disability may be established based on subjective complaints of pain.[28] The "pain standard" requires that the plaintiff first produce medical or other evidence of an underlying medical condition. Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[29] "Pain alone

---

[27] 20 C.F.R. § 404.1528.

[28] Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

[29] Id.

can be disabling, even when its existence is unsupported by objective evidence."[30] However, a claimant's subjective complaints of pain do not conclusively establish a disability unless accompanied by medical evidence.[31]

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[32] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[33]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[34] assessment to Plaintiff's subjective complaints by noting that Plaintiff presented objective medical evidence that established a right shoulder impingement, degenerative disc disease and a history of medial meniscus tear that were considered "severe." (R. 21.) Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's complaints regarding the intensity of his pain and the inability to work were not supported by the record of medical evidence. (R. 20.)

---

[30] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[31] 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms *shall not alone be conclusive evidence of disability* as defined in this section; there *must* be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability") (emphasis added).

[32] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[33] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[34] Marbury, 957 F.2d at 839.

In making this finding, the ALJ articulated several reasons for finding that Plaintiff's subjective complaints of pain were not credible and that the level of pain did not prevent Plaintiff from performing work at the medium level.

The ALJ conducted a thorough examination of Plaintiff's medical history, including Plaintiff's complaints of pain. The ALJ noted and properly recognized that Plaintiff complained of persistent left shoulder pain and disabling right knee pain. (R. 19.) The ALJ appropriately took into account the fact that despite Plaintiff's "allegation of severe, chronic pain, he advised he would only resort to taking over the counter medication," a statement that is not consistent with the level of pain asserted by Plaintiff.

As part of his analysis, the ALJ relied upon the fact that during the period of around Plaintiff's onset date, Plaintiff continued to hold himself out as able to work. (R. 19.) During the hearing, Plaintiff testified that after 25 years of driving for his company, it went out of business just six months shy of his retirement. (R. 199.) Plaintiff recounted that after his employer went out of business he collected unemployment for about a year while looking for other work. (R. 199-200.)

Additionally, the ALJ highlighted in this decision that Plaintiff's treating physician, Dr. Kelman, released Plaintiff to full work status only one month prior to Plaintiff's alleged onset date. (R. 19, 131.) Moreover, the ALJ properly pointed out that four months after Plaintiff's alleged onset date, Dr. Bendowski - who treated Plaintiff's shoulder impingement - reported no work restrictions and advised that he did not plan to reexamine Plaintiff until one year later if Plaintiff's condition "remains stable." (R. 19, 161-162.)

Furthermore, with regard to Plaintiff's shoulder and knee pain, the ALJ found that "the objective and other evidence of record as alleged do not support the intensity, persistence and functionally limiting effects of claimant's symptoms." (R. 20.) Specifically, the ALJ stated that Plaintiff had not "received the type of medical treatment one would expect for a totally disabled individual." (R. 19.) As noted by the ALJ, a May 2003 consultative examination conducted by Dr. Demmi revealed that Plaintiff's motor strength for his shoulders and knees was a 5/5. (R. 19, 174.) While Dr. Demmi reported right knee crepitus and tenderness Dr. Demmi, nonetheless, found that Plaintiff's range of motion was normal, his motor sensory and reflexes were normal, and his straight and seated leg raises were normal. (R. 147.)

The ALJ also pointed out that the August 2003 MRI of Plaintiff's left shoulder revealed an intact rotator cuff without full thickness tear that Dr. Bendowski thought might be causing Plaintiff's pain. (R. 19, 159-160.) Around that time, Dr. Bendowski also suggested alternative treatment, including cortisone injections, which Plaintiff did not pursue because of a claimed allergic reaction to cortisone. Instead, Plaintiff "opted to try over-the-counter Aleve to see what type of relief he gets with this. If he feels he is not getting sufficient relief of his symptoms, we will try prescription anti-inflammatory medications." (R. 20, 157.) As the ALJ noted, there is no further evidence or other medical documentation evidencing that Plaintiff had any subsequent visits in which he requested prescription medications. (R. 20.)

Lastly, the ALJ noted that there was no evidence supporting Plaintiff's allegations of severe pain due to degenerative disc disease. (R. 20.) The only evidence contained in the record is an MRI that did not reveal any disc herniation, fracture deformity or bony

neoplasm. (R. 111.) There are no other reports or treating notes addressing the effect of this impairment on Plaintiff's exertional capacity.

Accordingly, the Court concludes that the ALJ followed the Eleventh Circuit pain standard in analyzing whether the Plaintiff's subjective complaints were credible and in assessing Plaintiff's RFC. The ALJ articulated specific reasons for rejecting Plaintiff's testimony that he had disabling symptoms or limitations, which reasons were based upon the medical evidence and other substantial evidence of record.

Therefore, the Court concludes that the ALJ properly found that Plaintiff had the RFC to return to medium work and thus the ALJ's conclusion that Plaintiff could return to his past relevant work as a truck driver is supported by substantial evidence.

## V. **CONCLUSION**

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 27, 2007.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel